Filed 12/20/13  P. v. Harwood CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055435 |
| v. | (Super.Ct.No. INF053801) |
| BRIAN SAUL HARWOOD, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Affirmed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant Brian Saul Harwood appeals from his conviction of first degree murder. (Pen. Code, § 187, subd. (a).)  He contends (1) the evidence was insufficient to support the jury's finding that the murder was willful, deliberate, and premeditated, and (2) the trial court erred in admitting prejudicial evidence of defendant's prior crimes or, in the alternative, his counsel provided ineffective assistance.  We find no error, and we affirm.

## II.  FACTS AND PROCEDURAL BACKGROUND

On March 17, 2006, police officers received a report that a body had been discovered in a vacant lot in Palm Springs where homeless people lived.  The body was identified as that of John Baird.

An autopsy revealed that Baird had died from blunt force trauma to his head and torso with compression of the neck as a contributing cause.  He had suffered eight fractured ribs, a ruptured liver, and a contusion of his right lung.  He had extensive blunt force injuries to his face, head, and neck, including cuts that reached to the bone, a broken nose, bruising of his mouth and tongue, a black eye, and abrasions and scrapes on the top and back of his head.  He had suffered a contusion on the right side of the brain that could have been the result of a direct blow or of a blow to the opposite side of the head that was so forceful it caused the brain to bounce against the right side.  He had neck compression injuries consistent with strangulation, including bruising and a fracture to the hyoid bone, which had required significant force.  In addition, he had hemorrhages in his eyes indicative of strangling.  To cause death, manual strangulation must be

2

sustained for a minimum of two to three minutes. Baird had a blood alcohol level of 0.21 percent at the time of his death.

On March 20, 2006, Detective Troy Castillo of the Palm Springs Police Department spoke to Batiya Lane, a social worker at a resource center for homeless people in Palm Springs. Lane told the detective that the center had recently assisted defendant and Baird in obtaining California identification cards from the Department of Motor Vehicles (DMV). Defendant had appeared to be high on drugs and had referred to his mental health problems.

Steven Hayslip had known defendant for about a year. Hayslip testified that defendant and Baird had been in a volatile relationship, and they frequently argued, often over beer. Defendant had been aggressive with others in the homeless camp. On the morning of Baird's death, defendant was upset with Baird and told Hayslip he was going to kill him. Hayslip did not take the threat seriously; he thought it was just part of an ongoing argument.

Detective Castillo located defendant, who agreed to go to the police station to talk about the investigation. Defendant later agreed to accompany detectives on a walkthrough of the scene where an altercation with Baird had begun and ended. The interview and walk through were videotaped, and the tape was played for the jury with an accompanying transcript. At the end of the interview, the detective told defendant that Baird was deceased. Defendant appeared sad and upset but not distraught.

During the interview, defendant stated he had lived with Baird but had broken up with him on March 10, 2006, so he could get back on his feet, get a job, and enter a

3

rehabilitation program for his drinking problem. He initially denied being involved in Baird's death and said he had seen Baird only twice since March 10. Defendant told Detective Castillo that he and Baird had split up after arguing "over finances, over [defendant] wanting to go [his] direction. And be with other people." Baird had "tr[ied] to beg [him] to stay and try to work out. [Defendant] said I can't do it no more John. I don't want to be here."

Defendant said he recalled getting beer with Baird and walking back to their campsite. He claimed he had been drinking to the point of blacking out and did not remember much about that day. He later admitted he had grabbed Baird by the jacket and thrown him into the bushes multiple times as they were walking back to the vacant lot from a convenience store. Baird had pushed him and hit him with a backpack that was filled with bottles of beer and had hit him in his newly-pierced ear with a cell phone. Each time he knocked Baird down, he helped him back to his feet. When they arrived at the camp, he threw Baird's gear on the ground and started to leave, but Baird yelled for him to come back. Defendant jumped over a fence and cut his hand on razor wire. Baird grabbed him, bit him, and threw beer bottles at him while the men argued.

During the walkthrough, defendant told the detective he and Baird had been talking about getting married. Defendant pointed out the locations where they had argued and the three places where he had pushed Baird down into the bushes, each time after Baird struck him first.

Detective Castillo noticed that defendant was wearing a gold hoop earring that appeared similar to the one Baird had been wearing in his DMV identification

4

photograph taken on March 14, 2006. Baird was not wearing the earring when his body was discovered. Defendant had not worn an earring when his own DMV identification photograph had been taken on March 14. Defendant said Baird had pierced his ear on Friday, March 10, 2006, and had given him a gold "French hoop" earring.

While defendant remained in local custody, audio recordings were made of calls he made to his mother and stepfather. Recordings of 19 of those calls were played for the jury. During the calls, defendant repeatedly said he was going to "beat" the case by "going the insanity route" or made similar comments about raising an insanity defense.

The manager of a sober living facility in northern California testified that defendant had resided at the facility for about a week in December 2004. Late one night, defendant demanded his money back so he could leave. The money for defendant's stay had been deposited by defendant's stepfather, and the manager asked defendant to wait until morning to settle the finances. Defendant became angry and yelled. He retrieved an ax and struck the manager's bedroom door, threatening to kill him if he did not return the money. Another resident of the facility called 911 and assisted in disarming defendant before the police arrived. Defendant was charged with misdemeanor criminal threats and brandishing a weapon.

**A. Defense Evidence**

Defendant's stepfather, Gary Michael Shearn, testified that defendant had lived at a "special school designed to help people . . . to learn skills and be out in society that needed extra help" during his teen years. He moved home for a year after graduating and was awarded Supplemental Security Income (SSI) benefits because of a mental disability

5

that had occurred at birth. Shearn became the payee on defendant's benefits because defendant was unable to handle money. Defendant abused alcohol and used methamphetamines. He had been placed in numerous residential treatment facilities, but he had never completed any of the programs. While he was incarcerated between 2006 and 2009, defendant called his parents more than 100 times. He was sometimes rational, but other times he was unstable and would yell and threaten to kill himself. He took multiple psychotropic medications.

Defendant's mother, Patti Lee Harwood (Patti) testified that defendant was brain damaged at birth. He was in special education classes throughout school. He had behavioral problems in school and was on prescribed medications.

Dr. Morton Kurland, a psychiatrist, testified defendant had been psychotic on and off during his lifetime. Some of the documents Dr. Kurland reviewed indicated that defendant had "malingered" in the past to get what he wanted, but Dr. Kurland disputed those records, stating that instead defendant had "distorted reality." In his opinion, defendant was not bright enough to have mimicked psychosis for so many years.

### B. Rebuttal Evidence

Dr. Craig Rath, a forensic psychologist, stated his opinion that defendant had a personality disorder, a psychotic disorder, and possibly a substance abuse problem. His personality problems led him to seek instant gratification and to do what he wanted when he wanted to do it. Defendant had admitted malingering in the past for secondary gain.

C. **Verdict and Sentence**

The jury found defendant guilty of first degree murder. (§ 187, subd. (a).)

Thereafter, a trial took place on defendant's plea of not guilty by reason of insanity, and

the jury found defendant was sane at the time of the offense.[1]

The trial court sentenced defendant to 25 years to life in prison.

### III. DISCUSSION

**A. Sufficiency of Evidence of Premeditation and Deliberation**

Defendant contends the evidence was insufficient to support the jury's finding that

the murder was willful, deliberate, and premeditated.

*1. Standard of Review*

"'On appeal we review the whole record in the light most favorable to the

judgment to determine whether it discloses substantial evidence—that is, evidence that is

reasonable, credible, and of solid value—from which a reasonable trier of fact could find

the defendant guilty beyond a reasonable doubt. [Citations.]'" (*People v. Abilez* (2007)

41 Cal.4th 472, 504.)

*2. Analysis*

"'The process of premeditation and deliberation does not require any extended

period of time. "The true test is not the duration of time as much as it is the extent of the

reflection. Thoughts may follow each other with great rapidity and cold, calculated

judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz*

---

[1] Because defendant does not raise any issue relating to the sanity phase of the trial, we will not discuss the evidence from that phase.

(2002) 27 Cal.4th 1041, 1080.)  In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the court identified three factors that may support a finding of deliberation and premeditation:  planning activity, motive, and manner of killing.  (*Id.* at pp. 26-27.)  The three *Anderson* factors reflect a "'framework'" for "'assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.'"  (*Koontz, supra*, at p. 1081.)

As to planning activity, defendant told Hayslip on the morning of the day Baird was murdered that he was going to kill Baird.

As to motive, the evidence indicated that defendant wanted to end the relationship with Baird and was getting annoyed that Baird wanted to continue seeing him.  The jury could reasonably conclude that such evidence indicated a plausible motive for the killing.

As to the manner of the killing, defendant used two separate methods:  beating and strangling.  In *People v. Perez* (1992) 2 Cal.4th 1117 (*Perez*), the defendant stabbed the victim 38 times, using a second knife after the first broke.  The court concluded the manner of killing indicated premeditation and deliberation, explaining that using two knives "b[ore] similarity to reloading a gun or using another gun when the first one has run out of ammunition," thus providing the perpetrator with an opportunity to reconsider the deadly consequences of his actions.  (*Id.* at p. 1127-1128.)  Here, the jury could reasonably determine that shifting from beating to strangling likewise gave defendant an opportunity to reflect on the consequences of his actions.  Moreover, the coroner testified that death by strangulation requires the sustained application of compression for a minimum of two to three minutes.  (See *People v. Stitely* (2005) 35 Cal.4th 514, 544

8

[pathologist's testimony that "lethal pressure had been applied to [the victim's] neck for a 'long' time," "suggest[ed] defendant had ample opportunity to consider the deadly consequences of his actions"].)

In the instant case, in addition, the evidence indicated that defendant had stolen Baird's earring after the killing. In *Perez*, the defendant searched drawers and jewelry boxes and changed a Band-Aid on his hand after killing the victim, which the court characterized as "inconsistent with a state of mind that would have produced a rash, impulsive killing." (*Perez*, *supra*, 2 Cal.4th at p. 1128.) The court stated that although those facts were "not sufficient in themselves to establish premeditation and deliberation, these are facts which a jury could reasonably consider in relation to the manner of killing." (*Ibid.*) Here, likewise, the theft of Baird's earring was additional evidence that supported the jury's verdict, even if not sufficient in and of itself to establish premeditation and deliberation.

Defendant points to other evidence that suggested he did not act with premeditation and deliberation, specifically, his statements to officers which showed he had been unaware of Baird's death when he left the vacant lot, and his statements to his parents that he killed Baird in response to a sexual assault. The jury was free to reject those self-serving statements. "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" (*People v. Bean* (1988) 46 Cal.3d

9

919, 932-933.) We conclude sufficient evidence supports defendant's conviction of first degree murder.

**B. Other Crimes Evidence**

Defendant contends the trial court erred in admitting prejudicial evidence of his prior crimes.

### 1. Additional Background

As recounted above, Shearn, defendant's stepfather, testified that defendant had resided at a school for the learning disabled as a teenager. Shearn stated that the school was for students who "needed extra help," and defendant was there "because of his actions." In a sidebar conference, the prosecutor pointed out that Shearn's testimony had left the impression that the school was a "mental-health-benefit kind of school," when in fact, the facility was a sex offender children's group home, and defendant had been placed there because he was a sex offender. The trial court ruled the prosecutor could not bring the circumstances of defendant's sexual conduct or the nature of the school before the jury unless the next witness, defendant's mother, "open[ed] the door further."

During defense counsel's direct examination of Patti, she testified that defendant had been sent involuntarily to a special home, and following an "incident" there, he had been taken to two other homes, the final one being the Excel Group Home (Excel). Defense counsel later asked, "Okay. And later on, let's say from grade ten onward, were you aware of any behavior problems that [defendant] was suffering from?" Patti responded that defendant had been repeatedly raped when he was younger.

10

Out of the presence of the jury, the prosecutor moved to revisit whether she could question Patti about the nature of the Excel placement. The trial court found that the impression had been left that Excel was "more just a trade school." The court continued: "But what your witness did—the burden is on each lawyer, when I make rulings, to make sure the witnesses are not going to blurt out something that you know is not going to be admissible. Sometimes they do it anyway; I'm not necessarily blaming you. But she's created the impression that [defendant] was the victim. He was victimized a few times, I don't know how many times altogether. [¶] And because they blurted out that information, I think the prosecution has the right and duty to go into that reason he was in that home and why he was in that home, what type of life skills that they were giving him." The prosecutor then questioned Patti about defendant's sexual offenses and predatory activities as a juvenile. Specifically, the prosecutor elicited evidence that defendant had, at the age of 14, pleaded guilty to a sexual assault on an 11-year-old child; engaged in oral copulation and masturbation with another resident at a group home; and been asked to leave another group home because of "sexually acting out using a plunger and scouring brush."

The trial court instructed the jury with CALCRIM No. 303, that certain evidence had been admitted for a limited purpose and could be considered "only for that purpose and for no other." The trial court further instructed the jury with CALCRIM No. 375 that evidence of uncharged crimes could be considered only if proved by a preponderance of the evidence, and then could be considered only for limited purposes of showing intent, mistake, or accident, and for no other purpose.

11

*2. Analysis*

As a general rule, subject to certain exceptions, evidence of a defendant's uncharged crimes or bad acts is inadmissible in a criminal prosecution. (*People v. Schader* (1969) 71 Cal.2d 761, 772.) To be admissible, such evidence must be relevant to prove some fact other than the defendant's criminal disposition. (Evid. Code, § 1101, subd. (a).) Evidence of uncharged crimes always involves the risk of serious prejudice, regardless of its probative value. (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) In *People v. Thompson* (1980) 27 Cal.3d 303, disapproved on another ground in *People v. Rowland* (1992) 4 Cal.4th 238, 260, the court held that "[a]s with other types of circumstantial evidence . . . admissibility [of other-crimes evidence] depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence. [Citation.]" (*People v. Thompson*, *supra*, at p. 315.) In addition, Evidence Code section 1101, subdivision (c) allows the admissibility of other-crimes evidence "offered to support or attack the credibility of a witness."

Here, the trial court's justification for admitting the evidence was that the defense had "'opened the door'" by creating a false impression of the nature of a residential facility where defendant had lived as a teenager. However, "[t]he fact that a topic is raised on direct examination and may therefore appropriately be tested on cross-examination . . . does not amount to a license to introduce irrelevant and prejudicial evidence merely because it can be tied to a phrase uttered on direct examination."

12

(*People v. Luparello* (1986) 187 Cal.App.3d 410, 426.)  In *Luparello*, the court held that the prosecutor's attempt to cast one of the defendants as a violent gang member after a witness merely described certain headgear was flagrant misconduct but was nonetheless nonprejudicial.  (*Id.* at pp. 426-427.)

Defendant argues that the record does not show that the trial court applied the three-step analysis as set forth in *Thompson* and its progeny.  The trial court stated that Patti's testimony had left the impressions that defendant's group home placement was "more just a trade school" where defendant could "learn coping skills," and that defendant was the victim.  The thrust of the defense in this case was that defendant had been brain damaged and psychotic for most of his life and was thus unable to form the intent to kill Baird or to premeditate and deliberate the killing.  His parents' testimonies suggested that he had been placed in group homes at a young age to receive help for his psychological problems and to learn living skills.  Although the evidence that his placement in group homes had resulted from his sex offenses was indeed prejudicial, it was also highly probative and material to dispel the misimpression created by his parents' testimony.

In addition, Patti's testimony indicated that defendant had been the victim of sex offenses, not a perpetrator.  Evidence of defendant's own sex offenses was properly admissible to impeach Patti's credibility.  We conclude the trial court did not abuse its discretion in admitting the challenged evidence.

13

## C. Assistance of Counsel

Defendant argues that if we conclude the prior crimes evidence was properly admitted because the defense opened the door, his trial counsel provided ineffective assistance by allowing the door to be opened.

### 1. Analysis

To establish a claim of ineffective assistance, a defendant must establish both that his counsel provided deficient representation and that a more favorable outcome was reasonably probable in the absence of counsel's shortcomings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) We presume counsel's conduct falls within the wide range of professional reasonableness, and we give great deference to counsel's tactical decisions. (*Id.* at p. 688.) Thus, we do not reverse a conviction for ineffective assistance of counsel unless the record discloses there was no rational tactical purpose for counsel's act or omission. (*People v. Frye* (1998) 18 Cal.4th 894, 979, 980, overruled on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421 fn. 22.)

Our Supreme Court has repeatedly rejected claims of ineffective assistance based on counsel's failure to anticipate nonresponsive testimony. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1140; *People v. Mayfield* (1997) 14 Cal.4th 668, 787; *People v. Jennings* (1991) 53 Cal.3d 334, 380.) Here, as the trial court pointed out, Patti's response to defense counsel's questions was indeed nonresponsive and blurted out. Moreover, on direct appeal, we do not assume on the basis of a silent record that defense counsel in fact failed to admonish Patti to avoid testifying about the reasons for defendant's placement at the school. (See, e.g., *People v. King* (2010) 183 Cal.App.4th 1281, 1299.)

14

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


HOLLENHORST

Acting P. J.

We concur:

KING

J.

MILLER

J.